## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

FAQUAN HILL,

               Plaintiff

     v.

LAUREL HARRY, *et al.*,

             Defendants.

CIVIL ACTION NO. 3:24-CV-01393

(MEHALCHICK, J.)

### MEMORANDUM

Plaintiff Faquan Hill, proceeding *pro se* and *in forma pauperis*, has filed an amended complaint alleging a campaign of abuse and harassment by various employees of the Pennsylvania Department of Corrections ("DOC"). (Doc. 12). Pursuant to 28 U.S.C. § 1915A, the Court will permit Hill to proceed on certain claims against nine of the 27 named defendants but dismiss all other claims. The Court will deny Hill's motion for appointment of counsel (Doc. 14) without prejudice.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The Court granted Hill leave to file this amended complaint because his original complaint (Doc. 1) did not state a plausible claim for relief. (Doc. 9). The amended complaint is prolix, but the Court summarizes Hill's allegations to the extent relevant to his claims, mindful of the requirement that *pro se* pleadings be "liberally construed." *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Hill alleges that he is a "D-roster" inmate[1] who has been housed in solitary confinement in the "DTU"[2] at various DOC institutions. Between May 2022 and January 2023, Hill was generally incarcerated at SCI-Rockview ("Rockview"), but repeatedly transferred to SCI-Phoenix ("Phoenix") for court hearings. On August 29, while Hill was on suicide watch at Phoenix, he asked Unit Manager Fanrak for permission to make "an emergency call to the DOC abuse hotline." A phone was brought to Hill's cell, and Hill made "several calls" to the abuse hotline to "report various abuse issues that happened to him" at Rockview. Hill also reported that he had told Fanrak, Deputy Sipple, and CCPM Muick about the abuse and that they had "neglected to help [Hill] avoid going back to SCI-Rockview to avoid further abuse." During these calls, Lieutenants Baity and Mertin were standing near Hill's cell "eavesdropping." After the calls, Baity allegedly told Hill that he "heard everything and was going to tell [Fanrak, Sipple, and Muick] that [Hill] was 'SNITCHING' on them and make them send [Hill] back to SCI-Rockview immediately so [Hill] could continue to be abused." Mertin allegedly "co-signed" Baity's statement. Baity and Mertin allegedly "taunted and teased" Hill through the intercom in his cell by calling him a "snitch" and a "bitch" for phoning the abuse hotline, and said that they "would make sure [Hill] would be immediately transferred back to SCI-Rockview in a body bag within 24 hours."

---

[1] "The D Stability Code . . . applies to inmates who have the most significant mental health needs and entitles them to the greatest amount of mental health resources available." *Dooley v. Wetzel*, 957 F.3d 366, 370 (3d Cir. 2020) (citing Pa. DOC Reg. § 13.8.1(1)).

[2] The DTU, or Diversionary Treatment Unit, is a form of high security housing for inmates with mental health needs. *See Brown v. Baronner*, No. 3:19-CV-0374, 2022 WL 905538, at *4 (M.D. Pa. Mar. 28, 2022).

Later that day, Baity allegedly told another officer ("John Doe") "to give [Hill] a razor so he could kill himself." Officer Doe, who is not named as a defendant in this case, allegedly gave Hill a razor even though Hill was on suicide watch. When he returned to his cell, Hill "started to cut himself with the razor and then swallowed it as an attempt to commit suicide." He began spitting up blood, and several inmates in nearby cells yelled for emergency help. Baity and Mertin allegedly "began taunting [Hill] and telling him to die slow." "Almost two hours" after the calls for help, Baity, Mertin and several unnamed officers "cell extracted" Hill and escorted him to a psychiatric observation cell ("POC").

The balance of Hill's complaint to this Court is dedicated to legal paperwork that Hill lost during the extraction, his unsuccessful attempts to retrieve it, and an alleged campaign of harassment by various DOC employees in retaliation for his complaints about the lost paperwork and other prison conditions. Hill alleges that his property was not retrieved from his cell after the extraction, despite a DOC policy which allegedly requires that "an inmate[']s property is supposed to be immediately brought to the area where [the] inmate is housed." On August 30, C.O.s Greaves, Shoanberger, Lentz, and a lieutenant ("Jane Doe") told Hill that he was being transferred back to Rockview. Hill inquired about his legal property, but these officers "said that it was never brought to the POC storage area as it should [have] been," and that it "might" still be left in his old cell because Mertin and Baity were "angry" about Hill's phone calls and the fact that they had to extract him from the cell. An "intake sergeant," also referred to as "John Doe,"[3] said that he had packed Hill's property "on a bus that left earlier that morning to SCI-Benner and would make its way to SCI-Rockview." Hill protested

---

[3] The complaint asserts claims against "SCI Phoenix Property Sgt. John Doe." The Court infers that this is not the same "John Doe" allegedly involved in Hill's suicide attempt.

that the property should have been transferred in the same vehicle as Hill. Shoanberger "said that would have been true if [Hill] did not upset" Mertin and Baity, which Doe allegedly confirmed. During the journey back to Rockview, Hill continued to protest to Lentz and Shoanberger about the mishandling of his property. Lentz "told [Hill] that if he would stop complaining and let the situation go that they would stop at 'Royal Farms' and get him some chicken." The officers ultimately did stop at Royal Farms and "tr[ied] to bribe [Hill] with food to keep his mouth shut."

Upon arrival at Rockview, an intake sergeant asked where Hill's property was, to which Shoanberger replied: "[Hill] pissed the wrong people off." When he was returned to the Rockview DTU, Hill raised the issue with Unit Manager Knapp. Knapp allegedly responded that he "had heard that [Hill] had made many complaints about him to the abuse hotline and the PREA investigator," "that he would make [Hill's] life a living hell," and that "if he gets his hands on any of [Hill's] property he would throw it in the garbage."

Hill filed a grievance about his lost property and raised the issue at weekly "PRC" meetings, which were arranged by staff to discuss his DTU status. At one such meeting, Deputy Rowe, CCPM Miller, Major Halderman, PSS Hull, and Knapp were in attendance. In addition to the lost property, Hill complained that he had received "no basic issue of property of hygiene products, bed sheets, and clean clothes." Knapp allegedly admitted that "he refused to give [Hill] any property." All five defendants at this meeting allegedly agreed that Hill "should not be given any basic issue property or clean clothes for at least another week because [Hill] deserved to suffer for crying to PREA about his DTU staff."

Hill also complained to Facility Manager Salamon, who allegedly remarked that Hill "could kiss his legal property goodbye and that he would never get it back." Salamon allegedly

explained that Hill's complaints had upset "a lot of SCI Rockview staff," including herself, and that she would direct the grievance coordinators, Nikki Paul and K. Brubaker, to "find a reason" to dismiss any grievance Hill filed because they were "a tight knit family." Brubaker ultimately denied Hill's grievances for "made[-]up and[/]or confusing reasons that did not coincide with DOC policy and that [Hill] was not responsible for." Hill appealed, but these appeals were denied on similar grounds. Hill filed additional grievances, which were denied by SCI-Phoenix grievance coordinator "K. Owens" on the basis that they "dispute[d] previous grievances, appeal decisions, or staff members who rendered those decisions."

At the next weekly meeting on September 21, Hill renewed his complaints about the lost property. CCPM T. Miller allegedly told Hill that he would be transferred out of the prison, and that if he "kept making an uproar about the missing legal property," he would send another officer, Bower, to "kick [Hill's] ass." Knapp said that SCI-Phoenix never sent the property and that if it had, he "would not [allow Hill] to have it in his cell." After the meeting, Knapp came to Hill's cell and allegedly "told [Hill] to let him see his penis and if [Hill] refused he would 'never receive' his tablet and missing legal property." When Hill refused, Knapp allegedly continued: "I got Klans man juice to get you hung without a noose and mute all your grievances of you bitching and snitching[. Y]ou're never going to see your tablet or legal property again."

Hill made written complaints to "DTU Property Lieutenant Emmel," but received no response. When he confronted Emmel, Emmel allegedly stated that he was "too drunk to remember or care." During this conversation, Bower approached Emmel and allegedly said: "Was this n***er monkey asking you about his legal property? . . . [I]f I catch you talking to this monkey again your 'Good Ole Boy' pass is officially revoked!" Bower allegedly told Hill:

"Miller told me I have free reign to beat you like you['re] my slave if you ask anyone about that f***ing legal property."

Hill also complained to Lieutenants Butler and Stover about these remarks and other incidents of harassment at Rockview. Butler allegedly told Hill that he "should have known that he had to go through the 'grind up' [and] on the 'chopping block' for being a whistle blower." Stover said that he did not believe Hill, and that he would tell Rowe that Hill was "full of shit" and should not be allowed to have any of his missing property. Stover allegedly "said the only way he could [guarantee]" that Hill could recover his property was if he waived his prior allegations against Knapp. Stover and Butler allegedly "coerced" Hill to write a statement recanting his prior allegations against Knapp, which Hill wrote out of "fear and coer[c]ion" that he would not receive his property unless he did so.

On September 23, Knapp and Bower assigned Hill to a cell with an inmate "who was incarcerated for viciously raping and beating a juvenile girl who was related to [Hill's] child's mother." This inmate had allegedly told Knapp that he would "stab [Hill] if he were to move in with him." Knapp and Bower told Hill that this cellmate was chosen as punishment for his complaints. Hill received a misconduct citation for refusing the placement. Allegedly, Rowe later said of this incident: "[W]e were hoping you moved in and you guys killed each other but you let us down . . . he's a crip and you['re] Blood so we were hoping you guys did us a favor and shed each other[']s blood." Hill protested, to which Rowe allegedly replied: "Welcome to the DOC! We have to be just as criminal as you are to uphold law and order in here . . . Nobody will listen or believe you if you try to complain[,] and by the way [I] put 70 e[-]cigarettes on your head for any inmate in the DTU who wants to take the offer to have

you sent to the infirmary. This is how we handle punks like you who like to cry on grievances and PREAs."

On October 5, Hill told Rowe about his "coerced" statement regarding Knapp. Rowe allegedly told Hill that he was "washing his hands" of the issue and would not help Hill recover his property, because Hill "kept making a fuss" and had filed a false PREA complaint against Knapp. Rowe told Hill not to waste his time asking anyone else for help, because he had "burnt his bridges with everybody who could have helped him" at Rockview. Salamon also came to Hill's cell to advise him in person that "he would never see his missing legal property again" because of his "false PREAs and frivolous grievances." Salamon allegedly said: "It wouldn't matter if you had Jesus Christ as a co-signer to your grievances, [Paul and Brubaker] will continue to deny your grievances because I told them to reject or deny all your tattletelling grievances." On October 11, Bower allegedly punched Hill's cell window, called him a "bitch," and said that "he was going to get [Hill] killed for continuing to inquire about his missing legal property."

Hill's description of subsequent events is unclear, but in October and November 2022, various officers tried to look for or inquire about Hill's lost property. On October 13, Hill was taken to the Phoenix property room, where the officers working there found no record of any property of Hill's. At a subsequent meeting, Fanrak said that he had packaged Hill's legal property after the extraction and given it to Sgt. Stephany, but Stephany denied having received it. Muick said that "[p]eople forget important things and property gets lost around [here when] you piss the wrong people off." Sipple offered to "personally search through all the facilities['] property rooms with a fine tooth comb . . . and personally have it shipped back to Rockview" as long as Hill did not make any more grievances or calls to the abuse hotline.

Hill asked for a record of the meeting, which he was allegedly entitled to under DOC policy. Sipple allegedly said "we don't give inmates those documents in this prison." Fanrak said that Hill had "just shot hi[m]self in the foot" by making that request. After the meeting, Stephany allegedly told Hill that Rowe, Fanrak, Sipple and Muick were now refusing to help Hill find his property.

On November 19, Hill was transferred back to Rockview, where Bower continued to "torment and taunt" Hill with "racial slurs, physical threats, and various other forms of harassment." Bower allegedly told Hill that he was "a direct target of the Good Ole Boys," which Hill defines as "a Rockview white supremacist & misogynist gang made up of . . . Caucasian male SCI Rockview employees . . . including" Knapp, Bower, Emmel, Stover, Butler, and Miller. Knapp told Hill that he would make other officers "do whatever it takes to keep [Hill] jammed up with misconducts even if [Hill] did nothing wrong." On November 23, 2022, Hill asked to make a call to the abuse hotline to report abuse by Knapp, but "[e]very C.O. that was working the DTU that day" denied his request. Hill began kicking his cell door and screaming for help, until his counsellor, Ms. Moore, arrived. Moore spoke to Knapp and "made him allow [Hill] to make the call to the abuse hotline." Immediately after the call, Knapp allegedly "came to the phone cage and said 'You[']re getting written up you N***er because you didn't call the hotline[,] you were calling your darkie friends crying about me like you cried to that n***er bitch Moore[.] I just traced your calls[,] they were not to the abuse hotline.'" Hill received a misconduct citation, which was allegedly "dropped" because the phone records showed that Hill had called the abuse hotline.

On January 3, 2023, Hill was permanently transferred from Rockview to SCI-Somerset. Unnamed Rockview DTU property officers told Hill that Salamon "told them

specifically not to allow [Hill] to inventory any of his outgoing property." Hill was therefore charged "an astronomical shipping price" of $78.12 and received his property roughly a week later. Some of the paperwork was missing, while other documents allegedly had the word N***ER "written across the documents in big letters." On April 20, 2023, during another temporary transfer to Phoenix, Sipple told Hill that he needed to accept that his missing property would never be found, and that it was "below her pay rate" to try to help him.

Because of the lost documents, Hill alleges that he had "9 court dates postponed," and his "PCRA denied," because he "could not properly argue and/or support claims of his innocence." The Court's review indicates that in 2018, Hill was convicted in the Philadelphia Court of Common Pleas for aggravated assault and several related charges for attacking his girlfriend. *See Commonwealth v. Hill*, 236 A.3d 1119 (Pa. Super. Ct. 2020) (attaching trial court opinion).[4] Hill's lost property included documents relevant to the criminal case, some not presented at trial, that he contends support his innocence. These allegedly included photographs of the crime scene, records of communications involving Hill, the victim, and/or Hill's trial counsel, a witness affidavit, and medical records of the victim.[5]

## II.    28 U.S.C. § 1915A SCREENING

Under 28 U.S.C. § 1915A, the Court is obligated, prior to service of process, to screen a civil complaint in which a prisoner seeks redress from a governmental entity or officer or

---

[4] The Court may take judicial notice of opinions issued by other courts, "not for the truth of the facts recited therein, but for the existence of the opinion." *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

[5] Hill describes his theory of the alleged significance of these documents in considerable detail. *See* (Doc. 12 at 32-39). The Court has reviewed and considered these allegations, but in the interest of brevity does not reproduce them within this memorandum.

employee of a governmental entity. 28 U.S.C. § 1915A(a); *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court must dismiss the complaint if it fails to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010). The Court has a similar obligation with respect to actions brought *in forma pauperis. See* 28 U.S.C. § 1915(e)(2). In performing this mandatory screening function, a district court applies the same standard applied to motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Mitchell*, 696 F. Supp. 2d at 471; *Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 588 (W.D. Pa. 2008).

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the amended complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the elements that make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions' . . . ." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need the court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the amended complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

With these standards in mind, a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully pleaded,"

must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Further, the Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

III.    DISCUSSION

Hill now sues 27 defendants asserting Eighth Amendment claims premised on failure to intervene, "intentional infliction of emotional distress," denial of medical care, and negligence; First Amendment claims premised on retaliation, denial of access to courts, and "denial of expectation of privacy"; and Fourteenth Amendment due process and equal protection claims. He requests declaratory, injunctive, and monetary relief.

A.  SECTION 1983

Section 1983 is the vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. 42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a Section 1983 claim, a plaintiff must demonstrate that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995). "A defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement requires particular 'allegations of personal direction or of actual

knowledge and acquiescence.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Rode*, 845 F.2d at 1207).

It appears that Hill named numerous defendants because they have supervisory authority or were involved in responding to Hill's grievances. Neither is sufficient to establish liability under Section 1983. *See Dooley*, 957 F.3d at 374. Hill also named the Pennsylvania Department of Corrections, which is not a "person" that can be sued under Section 1983. *See Adams v. Hunsberger*, 262 F. App'x 478, 481 (3d Cir. 2008). Therefore, the Court assesses Hill's claims against those individuals for whom the complaint offers a factual basis to infer personal involvement in the alleged wrongs.

B. Eighth Amendment Claims

Hill asserts four theories of Eighth Amendment liability. First, he asserts claims for "failure to intervene to prevent [him] from being harassed[,] abused, discriminated against, and retaliated upon." However, a claim for "failure to intervene" is generally limited to the context of excessive force. *See, e.g., Armstrong v. Furman*, No. 3:19-CV-141, 2020 WL 5545270, at *6 (W.D. Pa. Sept. 16, 2020) (citing *Weimer v. Cnty. of Fayette, Pennsylvania*, 972 F.3d 177, 191 (3d Cir. 2020)). Although Hill alleges that several defendants verbally threatened him in various ways, there is no allegation that any defendant used excessive force against him.[6]

Next, Hill asserts that Defendants Baity, Mertin, Lentz, Shoanberger, Knapp, Bower and Rowe acted with deliberate indifference to his serious medical needs. For an Eighth Amendment claim on that basis, a plaintiff must "make (1) a subjective showing that 'the defendants were deliberately indifferent to [his or her] medical needs' and (2) an objective

---

[6] Hill does not allege that the cell extraction constituted excessive force, nor would the complaint support such an inference given Hill's description of his suicide attempt.

showing that 'those needs were serious.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (alteration in original) (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). Hill's description of his suicide attempt, and the alleged delays and taunting remarks by Baity and Mertin in response to inmates' calls for help, support Eighth Amendment claims against those defendants. However, the complaint does support an inference that any other named defendant was deliberately indifferent to his medical needs.[7]

Hill asserts an Eighth Amendment claim premised on "intentional infliction of emotional distress" against 18 defendants but does not specify the factual basis for these claims. While the racist language and other verbal abuse that Hill describes in the complaint is deplorable, "[i]t is well settled that verbal harassment of a prisoner . . . does not violate the Eighth Amendment." *Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006) (collecting cases); *see also Mickens v. Clark*, No. 1:24-CV-00190, 2025 WL 976701, at *10 (M.D. Pa. Mar. 31, 2025); *Baylor v. Pennsylvania Dep't of Corr.*, No. 1:12-CV-0341, 2013 WL 521957, at *4 (M.D. Pa. Feb. 11, 2013) ("[V]erbal abuse, even abuse involving racial or sexual harassment, is not actionable as a [Section 1983] claim."). Further, the alleged deprivation of "basic issue of property of hygiene products, bed sheets, and clean clothes" for two weeks, without further

---

[7] The intended basis for this claim against the other defendants is unclear. Within his claim for relief, Hill alleges that Lentz and Shoanberger "force[d him] to be transferred" from Phoenix back to Rockview following his suicide attempt, in violation of DOC policy, but the complaint does not explain how this action deprived Hill of medical care. Hill alleges that Knapp, Bower, and Rowe "den[ied Hill] with any follow up aftercare," but the complaint lacks any factual allegations to support this conclusory statement, nor any basis to infer that Knapp, Bower or Rowe were in any way involved in Hill's medical care. Similarly, the harassment Hill ascribes to Knapp, Bower, and Rowe, although deplorable, does not itself suggest deliberate indifference to a medical need.

detail, does not support an inference of an Eighth Amendment violation, particularly given that Hill does not allege that he suffered harm traceable to this deprivation.[8]

Hill also asserts Eighth Amendment violations premised on negligence, for "failure to keep [him] safe and protect him from unreasonable risks." Again, the intended factual basis for these claims is not clear, but "negligence" does not itself violate the Eighth Amendment. Beyond the previously acknowledged claims against Mertin and Baity connected with Hill's suicide attempt, the complaint does not plausibly show how any named defendant failed to keep Hill "safe." Further, to the extent these intentional infliction of emotional distress claims, or negligence claims premised on "unreasonable risks," were intended under state tort law, the defendants would be immune from such claims. *See Burton v. Wetzel*, No. 1:22-CV-1625, 2023 WL 5804324, at *3 (M.D. Pa. Sept. 7, 2023); 42 Pa. Con. Stat. Ann § 8522.

C. RETALIATION

Hill asserts violations of the First Amendment by 19 defendants[9] based on retaliation for his "filing grievances, PREAs, making calls to the abuse hotline, and preparing documents for a civil rights lawsuit." An inmate retains First Amendment protections when they are "not inconsistent" with prisoner status or with the "legitimate penological objectives of the

---

[8] *See*, *e.g.*, *Ivy v. Johnson*, No. 1:18-CV-1506, 2022 WL 3647264, at *8 (M.D. Pa. Aug. 24, 2022) (listing cases); *Massaquoi v. McConaughey*, No. 3:17-CV-938, 2020 WL 1908495, at *21 (M.D. Pa. Jan. 24, 2020) (denial of certain "basic issue" hygiene items was not an extreme deprivation), report and recommendation adopted, 2020 WL 859336 (M.D. Pa. Feb. 21, 2020); *Gittens v. Scholtz*, No. 18-CV-2519-RBK-KMW, 2019 WL 3417091, at *9 (D.N.J. July 29, 2019) (denial of clean clothes and sheets for fifteen days did not support a conditions of confinement claim).

[9] The complaint asserts multiple theories of retaliation against numerous defendants. The Court does not a separately analyze each theory for all defendants, but simply assesses whether the complaint states a retaliation claim in any form against each defendant.

corrections system." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).  To state a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he was engaged in constitutionally protected conduct, (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the plaintiff's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action. *Wisniewski*, 857 F.3d at 156 (citations and quotations omitted).

Hill has plausibly alleged that he was engaged in protected activity. A prisoner's PREA complaint, or expression of intent to file a PREA complaint, constitutes protected activity. *Naranjo v. Walter*, No. 22-3435, 2023 WL 5928506, at *2 (3d Cir. Sept. 12, 2023) (citing *Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016)). The complaint also supports an inference that Hill's calls to the "abuse hotline" were protected activity. *See Mack v. Warden Loretto FCI*, 839 F.3d 286, 298-99 (3d Cir. 2016) ("In this context, form is secondary to content . . . Mack's oral grievance sufficiently and timely put prison officials on notice that he was seeking redress, was conveyed to prison officials in a reasonable manner, and concerned conduct that the prison itself prohibits.").

Hill has also plausibly alleged that certain defendants took adverse actions against him, motivated by the protected activity. A permanent deprivation of an inmate's property is an adverse action for retaliation purposes. *See Mincy v. Chmielewski*, 508 F. App'x 99, 104 (3d Cir. 2013). The complaint therefore states retaliation claims against Baity, Mertin, and Sergeant John Doe, for allegedly depriving Hill of his legal documents on August 29 and 30, 2022, and against Salamon, for depriving Hill of property upon his transfer to SCI-Somerset on January 3, 2023.

Although the alleged denial of "basic issue" hygiene items, bedsheets, and clean clothes for two weeks does not itself show an Eighth Amendment violation, *see supra*, the Court finds that it supports an inference of adverse action. *See Watson*, 834 F.3d at 423 ("An adverse consequence need not be great in order to be actionable; rather, it need only be more than *de minimis*.") (quotation omitted); *Clark v. Zborovancik*, No. 3:23-CV-00041, 2024 WL 5361189, at *6-7 (W.D. Pa. Nov. 13, 2024) (denial of sheets and bedding for 18 days was adverse), report and recommendation adopted, 2025 WL 692112 (W.D. Pa. Mar. 4, 2025). On that basis, the complaint states retaliation claims against Rowe, Miller, Halderman, and Knapp[10], all of whom allegedly agreed to withhold these items from Hill because of his PREA complaints.

The complaint also states a claim against Bower for allegedly retaliating against Hill by trying to house him with an inmate who was planning to assault him, thus compelling Hill to refuse and receive a misconduct charge. *See*, *e.g.*, *Andrews v. Wetzel*, No. 2:19-CV-1443-NR-PLD, 2022 WL 1203842, at *2 (W.D. Pa. Apr. 22, 2022) (finding adverse action where the defendant "falsely engineered a scenario in which a misconduct was an inevitability" by assigning a cellmate the plaintiff would refuse); *Chruby v. Bearjar*, No. 3:17-CV-01631, 2018 WL 4537404, at *12 (M.D. Pa. Aug. 27, 2018) (assignment of new cellmate posing a particular risk to the plaintiff was an adverse action).

Although Hill claims that numerous other defendants refused to help him reclaim property or told him that he should not get it back, there is no allegation that any of the other defendants listed for this claim were responsible for his legal property, actively withheld it, or

---

[10] "PSS Hull," who allegedly joined in the agreement, is not named as a defendant.

even knew where it could be found. Without any involvement in the underlying deprivation, the various defendants' threats, taunts, broken promises to help him, or other unsavory comments are not "adverse actions" for retaliation purposes.[11] *See Snider v. Alvarez*, No. 18-CV-801, 2020 WL 6395499, at *17 (M.D. Pa. Nov. 2, 2020) ("Verbal threats and harassment are not sufficiently adverse to state a claim for First Amendment retaliation.") (collecting cases).

Hill also requests a preliminary injunction that would effectively "order[] all SCI Phoenix defendants to cease from retaliating against [Hill] when he returns back to SCI Phoenix very soon on temporary transfer for court." Because the complaint and exhibits do not show evidence of immediate irreparable harm, the request for preliminary injunctive relief will be denied. *See Wesley v. Sec'y Pennsylvania Dep't of Corr.*, 569 F. App'x 123, 125 (3d Cir. 2014) ("[A] showing of irreparable harm is insufficient [for preliminary injunctive relief] if the harm will occur only in the indefinite future. Rather, the moving party must make a clear showing of *immediate* irreparable harm.") (emphasis in original) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)).

---

[11] Specifically, the complaint states no claim against Butler and Stover for "coercing" Hill to withdraw his allegations against Knapp. Although the complaint indicates that Stover was dishonest with Hill about his desire or ability to help Hill recover his lost property (by "guaranteeing" that Hill could get it back), it does not suggest that either officer took any action against Hill or forced Hill to write the statement. Further, unlike with other viable defendants who explicitly expressed retaliatory intent, the complaint lacks any allegation showing why Butler and Stover would retaliate against Hill for complaints Hill made about other officers. *See Nunez v. Wetzel*, No. 1:21-CV-01484, 2023 WL 2385931, at *5 (M.D. Pa. Mar. 6, 2023) (listing dismissals of retaliation claims where the alleged retaliator was not the target of the protected activity).

D. Denial of Access to Courts

Finally, Hill pursues a claim for denial of access to the courts based on the loss of his legal documents. Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts. *See Lewis v. Casey*, 518 U.S. 343, 346 (1996). Where prisoners assert that defendants' actions have inhibited their opportunity to present a past legal claim, they must show (1) that they suffered an "actual injury," i.e., that they lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit. *Monroe v. Beard*, 536 F.3d 198, 205-06 (3d Cir. 2008) (quoting *Christopher v. Harbury*, 536 U.S. 403, 415 (2002)). The complaint must describe the underlying legal claim well enough to show that it is "more than mere hope." *Monroe*, 536 F.3d at 206.

Hill attaches the docket of his PCRA proceedings, which indicate that his PCRA evidentiary hearing was repeatedly continued between January and July 2023, when he was allegedly without his legal documents. *See* (Doc. 12-22). Although the Court is unable to evaluate Hill's claim that his PCRA petition was denied because he could not present the missing documents in support of his claim, his allegations sufficiently support a plausible inference that he was impeded from litigating a "nonfrivolous" PCRA claim. *See, e.g., Hall v. Lidwell*, No. 3:15-CV-1113, 2016 WL 6834032, at *3 (M.D. Pa. Nov. 21, 2016). Although Hill blames "all defendants" for failing to help him reclaim these documents, Baity, Mertin, and Sergeant Doe are the only defendants alleged to be personally involved in mishandling the property, so those are the only defendants appropriate for this claim.

E. REMAINING CLAIMS

The rest of Hill's claims are without merit as pled. Hill asserts that Mertin and Baity violated the First Amendment by eavesdropping on his phone calls, but the Constitution does not guarantee a right to private phone calls. *See United States v. Jarmon*, 14 F.4th 268, 272 (3d Cir. 2021) ("Inmates have no expectation of privacy in their phone calls . . . Prisoners know they are under constant surveillance. They have no general expectation of privacy during their incarceration, including in their own cells.") (citing *Hudson v. Palmer*, 468 U.S. 517, 525-26 (1984)). Further, any alleged violation of PREA or DOC policy in the handling of Hill's abuse complaints would not itself state a constitutional claim. *See Simms v. Houser*, No. 3:21-CV-0321, 2021 WL 5507746, at *6 (M.D. Pa. Nov. 24, 2021); *Pettis v. Everhart*, No. 3:19-CV-1308, 2020 WL 5548719, at *4 (M.D. Pa. Sept. 16, 2020); *see also Carr v. Bartlett*, No. 1:20-CV-00491-REP, 2024 WL 1308982, at *11 (D. Idaho Mar. 27, 2024) ("Plaintiff has no constitutional or statutory right to have his PREA complaint remain confidential from his custodians.").

Hill asserts a violation of his Fourteenth Amendment due process rights based on the denial of his property, but such a claim is not viable because Hill had an adequate means of "post-deprivation remedy" in the form of the DOC's grievance process. *See Hudson*, 468 U.S. at 533; *Monroe*, 536 F.3d at 209-10. Finally, he asserts a Fourteenth Amendment equal protection claim on the basis that all defendants "discriminat[ed] against him by treating him poorly" due to his race and religion. However, he has not alleged that he was treated differently from "similarly situated" individuals, as required for an equal protection claim. *See Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002).

## IV.    APPOINTMENT OF COUNSEL

Hill, who has been granted leave to proceed *in forma pauperis*, also moves for appointment of counsel. (Doc. 14). Indigent civil litigants possess neither a constitutional nor a statutory right to appointed counsel in a civil case. *Montgomery v. Pinchak*, 294 F.3d 492, 498 (3d Cir. 2002). However, a federal court may request that an attorney represent an indigent person on a *pro bono* basis. *See* 28 U.S.C. § 1915(e)(1). If the court determines that a claim has "arguable merit in fact and law," *Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993), the court should consider the litigant's ability to proceed *pro se* in light of a number of additional non-exhaustive factors, including: (1) the plaintiff's ability to present his or her case; (2) the complexity of the particular legal issues; (3) the degree to which factual investigation is required and the ability of the plaintiff to pursue such investigation; (4) the amount a case is likely to turn on credibility determinations; (5) whether the case will require testimony from expert witnesses; and (6) the plaintiff's ability to retain and afford counsel on his or her own behalf. *Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002); *Parham v. Johnson*, 126 F.3d 454, 457-58 (3d Cir. 1997); *Tabron*, 6 F.3d at 155-57.

Assuming *arguendo* that Hill presents claims of "arguable merit," the Court finds that appointment of counsel is not warranted at this time. Hill claims that the case will require complex issues, that he has limited knowledge of the law and limited access to the law library, and that a trial would likely involve conflicting testimony. Although litigation in federal court is not simple, the issues in this case do not appear "complex" in the sense of requiring specialized knowledge or expert testimony to understand. The defendants have not yet responded to the complaint, and it is premature to assess what issues will be contested or whether a trial will be required. Further, Hill's exhaustive complaint and numerous exhibits

suggest an ability to present his case and to undertake a factual investigation in support of his claims. Accordingly, the motion will be denied without prejudice to reconsideration either *sua sponte* or upon a future motion.

**V.    CONCLUSION**

The Court will permit Hill to proceed on Eighth Amendment claims of deliberate indifference to a serious medical need against Baity and Mertin, First Amendment denial of access to courts claims against Baity, Mertin, and Sergeant Doe, and First Amendment retaliation claims against Baity, Mertin, Doe, Salamon, Rowe, Miller, Haldeman, Knapp, and Bower. All other claims will be dismissed, and Hill's motion for appointment of counsel will be denied without prejudice. An appropriate Order follows.


**Dated: April 29, 2025**                                    *s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States District Judge**